IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**CAESAR WHITE, JR.,**
        **Plaintiff,**

**vs.**
                                   **No.  3:07cv461/LAC/MD**

**WENDELL HALL, et. al.,**
        **Defendants.**

_____

## REPORT AND RECOMMENDATION

This *pro se* action is brought pursuant to 42 U.S.C. § 1983 against the Sheriff of Santa Rosa County, Florida and several of his deputies.  Plaintiff, Mr. Caesar White, was a Santa Rosa County deputy trainee and later a deputy, but his employment was allegedly terminated because of his African American race and for no other cause.  He also alleges that he was treated differently from white deputy trainees and deputies, that he was denied both procedural and substantive due process, and that his rights under the Commerce Clause were violated, all under color of law and in violation of the Fourteenth Amendment.  The matter is now before the court on cross motions for summary judgment.

## PROCEDURAL HISTORY

Plaintiff originally brought this case pursuant to Title VII of the Civil Rights Act, 42 U.S.C. 2000e, and also pursuant to 42 U.S.C. § 1983. He sued Wendall Hall, Sheriff of Santa Rosa County individually and in his official capacity and Matthew E. Seevers, Deidre Hobbs, Jody Cochran, Pamela Moorer, Jerry Ranger, Rena Smith

and Paul Campbell individually. Plaintiff claimed that he was discriminated against in violation of Title VII of the Civil Rights Act when he was discharged from his employment with the Santa Rosa County Sheriff's Office due to his race and color, that he was discriminated against for the same reason when he was not given the same opportunities as white officers to correct his performance, that he was subjected to different terms and conditions of employment, and that policies and procedures were not applied to him in the way they were applied to white officers. Plaintiff claims that his rights were violated by the eight individual defendants under 42 U.S.C. § 1983 when he was not afforded the same rights as other workers concerning equal treatment, performance evaluations and the opportunity to correct substandard performance, and when he was wrongfully discharged.

Defendants filed a motion for partial summary judgment/motion to dismiss, asserting that plaintiff failed to his exhaust his administrative remedies and conditions precedent to the filing of this litigation, and that with respect to the § 1983 count, he had failed to allege a custom, policy or practice of race discrimination. Finally they assert their entitlement to qualified immunity in the absence of any allegation that they violated plaintiff's clearly established rights.

The undersigned submitted a report and recommendation finding that plaintiff had not exhausted his administrative remedies in that he failed to submit timely claims to the appropriate administrative agencies. It was also recommended that the 1983 claim be dismissed without prejudice because of its broad and inclusive claims that failed to put any defendant on notice of the claim against him or her. The report and recommendation was adopted by the district judge (doc. 30), and plaintiff was given leave to file a third amended complaint (doc. 29).

Now before the court are a motion for summary judgment filed by defendants (doc. 61) with statement of undisputed facts (doc. 62), deposition excerpts and affidavits (some unsigned) (doc. 63), and signed affidavits to complete those

previously filed unsigned (doc. 65). Also before the court is a motion for summary judgment filed by plaintiff (doc. 64) with exhibits. The court notified the parties of their obligations under Fed.R.Civ.P. 56 and N.D. Fla. Loc. R 56.1(B). (Doc. 66) Plaintiff then filed a response to the defendants' motion for summary judgment, misnamed "Motion for Summary Judgment, As It Relates to the Court's order Dated 03/19/2009" (doc. 71), and a statement of undisputed facts (doc. 70). Defendants have responded to the plaintiff's motion for summary judgment (doc. 75) with a statement of disputed facts in opposition to plaintiff's motion for summary judgment (doc. 76), and with an affidavit (doc. 77). The record for purposes of considering these cross-motions for summary judgment is complete, and the matter is ripe for consideration.

SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *see also Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996). However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the

case under the governing law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See *id.*; see also *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B&B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000); *Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). The court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2511. And, it is improper for the district court to make credibility determinations, such as between contradictory affidavits, on a motion for summary judgment. *Miller v. Harget,* 458 F.3d 1251, 1256 (11th Cir. 2006); *Bischoff v. Osceola County,* 222 F.3d 874, 876 (11th Cir. 2000); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). This is because at the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. See *Anderson*, 477 U.S. 249.

## FACTUAL BACKGROUND

Plaintiff, Caesar White, Jr., was hired as a deputy trainee by the Sheriff of Santa Rosa County, Florida on November 6, 2006. He was considered a probationary employee for the first year of his employment (doc. 63-2 at 4).[1] He was required to go through a training course under a succession of Field Training Officers (FTOs). He completed the required training, and on January 20, 2006 was assigned to a security shift as a Detention Deputy at the county jail (doc. 64, ex. C). His employment was terminated by the sheriff on May 1, 2007 for "Failure to satisfactorily complete agency field training program (training performance issues)." (Doc. 64, ex. 8).

The operative facts behind this action are fairly straightforward and are generally undisputed and, as discussed below, even when read in the light most favorable to Mr. White, any disputed issues of fact are not material. On January 16, 2007, while still in training, Mr. White had a disagreement with his supervisor, FTO Moorer, a black female, who criticized him for no reason.[2] He went to the shift supervisor, Lieutenant Cottrell, and said words to the effect that he could not take his FTO anymore and perhaps he should just quit (doc. 64, ex. U). A meeting was then held that included Lieutenant Cottrell, FTO Moorer, Mr. White and Captain Campbell, who had not previously been involved. Concerning the alleged comment to Lieutenant Cottrell, Mr. White said "he didn't exactly say it that way" but he didn't know what FTO Moorer wanted from him. He said that the misunderstanding was over a prisoner headcount, and that FTO Moorer had cursed him (doc. 64, ex. U).

---

[1] All references to the record will refer to the docket entry number and the subsections as numbered by the clerk. References to the exhibits to docket entry 64, Mr. White's motion for summary judgment exhibits, will be to his exhibit designation since his voluminous documents were not scanned by the clerk.

[2] By rank, FTO Moorer was at all relevant times a Corporal.

*Case No: 3:07cv461/LAC/MD*

Three days later, on January 19, 2007, a Friday, FTO Moorer gave Mr. White his End of Phase Report. She scored him as "not acceptable" in general appearance, accepting responsibility, seeking help with problems, accepting direction, accepting constructive criticism, professionalism with his FTO, and compliance with policy and procedure. She scored him as "acceptable" in professionalism with other deputies, professionalism with inmates, professionalism with the public, radio usage, quality of work, search techniques, tower operations and report writing. As weaknesses FTO Moorer indicated that Mr. White did not follow directions from his FTO without being sarcastic and that he had been counseled. She rated Mr. White's overall performance as unsatisfactory. Mr. White signed the report, but wrote above his signature that he disagreed, and felt that the problem was more personal than professional. (doc. 63-3, at 3-4).

Early the next Monday, January 23, 2007 Mr. White talked to Corporal Cochran, the training coordinator. He asked how long his remedial training would be (based on his unsatisfactory performance under FTO Moorer), but Corporal Cochran said she had not seen the report. Mr. White then asked if he could talk to her, and told her that FTO Moorer "did nothing about it" when an inmate had been assaulted, and that FTO Moorer showed favoritism toward an inmate worker. Corporal Cochran wrote a file memo saying she had called the assault incident up on her computer and saw that it had been reported and that FTO Moorer had followed procedure. She also notified the shift supervisor and administration of the allegations by Mr. White against FTO Moorer (doc. 63-3 at 14).[3]

A preliminary supervisory inquiry conducted on March 15, 2007 disclosed no policy violations on the part of FTO Moorer (doc. 64, ex. 5). It was noted that completion of the inquiry had been put on hold "due to attending

---

[3]Notwithstanding the unsatisfactory rating assigned by FTO Moorer, Mr. White was certified with the rest of his class and became a Detention Deputy.

training/conferences." (*Id*.). That same day Corporal Cochran told Mr. White to put his complaints against FTO Moorer in writing. He refused to do so, claiming that he had made his comments to Corporal Cochran in confidence, and that he was not required to make a written report. This refusal went up the chain of command, and Captain Smith (a black female) and Captain Campbell ordered Mr. White, in writing, to write a report concerning his allegations about FTO Moorer (doc. 63-3 at 26). He did so on March 23, 2007, noting that he had not intended to make a formal accusation against FTO Moorer, but that it bothered him that she claimed to be a "by the book" officer when she was anything but "by the book." (Doc. 63-3 at 16). He then made the following accusations against FTO Moorer:

1.   She talked on her cell phone for long periods.

2.   When problems arose as the result of her absences she would blame the trainees.

3.   She had seen a physical altercation between two female inmates and had done nothing.

4.   She told female inmates to harass the trainees.

5.   She wasn't following policy herself but would penalize others for not following policy.

(Doc. 63-3 at 16-17).

Lieutenant Dee Hobbs was ordered to investigate these complaints and on April 2, 2007 reported the results of her investigation. She had interviewed Mr. White, who told her that the original comments he made to Corporal Cochran were "informal" and that he was just giving his opinion in reference to the final evaluation of his performance given by FTO Moorer. He could not name the trainees who were blamed for problems other than himself. He said he saw inmate Pinkney hit inmate Barbara Cotner with her fist (both were female inmates). He did not write a report

about that incident because he was in training and did what his FTO told him to do (he did not say what, if anything, his FTO told him to do or not do), and he did not report the incident to the floor supervisor.  He said that he witnessed FTO Moorer tell female inmates Pinkney and Trotter to harass Deputy Olsen.  He was asked whether he had followed policy concerning the alleged fight between inmates Cotner and Pinkney (in the context of accusing FTO Moorer of not following policy), and he responded that he told FTO Moorer that he was uncomfortable about the fight, but that FTO Moorer told him she was not going to punish Pinkney because Cotner was leaving and putting her in lockdown would not be fair.  He explained that he had told Corporal Cochran of the fight incident "anonymously," and thought it had been handled.  He further stated that he did not understand why it took two months to follow up on his anonymous complaints.  He failed to explain why the accusations he made in his written report were different and more numerous than what he told Corporal Cochran on January 23.  He further said he had refused to make a written report because it "puts me in the position of possibly making a false statement against Deputy Moorer depending on how it is handled."  (Doc. 63-3, p. 21).

Lieutenant Hobbs interviewed FTO Moorer, who said that she did not witness inmate Pinkney hit inmate Cotner, that she had not told Mr. White not to write an incident report, and that she did not tell female inmates to harass trainees (*id*. at 22). Lieutenant Hobbs interviewed Deputy Olsen (the alleged victim of the order to harass trainees), who said he had never heard FTO Moorer tell the female inmates to harass the trainees (*id*.).  Corporal Cochran told Lieutenant Hobbs that during her January discussion with Mr. White, he had not mentioned anything about FTO Moorer talking on her cell phone or hanging out for extended periods with Deputy Richardson.  He told her only that she saw an inmate assault another and did nothing, and that she gave preferential treatment to inmate worker Johnny Davis (*id.* at 23).   Inmate Johnny Davis was not an inmate worker, so he could not have been

given preferential treatment in the manner alleged by Mr. White (*id*. at 27). Deputy Richardson told Lieutenant Hobbs that she did not hang out for extended periods with FTO Moorer (*id*. at 23). Inmates Cotner and Pinkney were not interviewed because they had been released. Inmate Trotter denied ever hearing FTO Moorer tell inmates to harass trainees (*id*.).

Based on her investigation, Lieutenant Hobbs found that Mr. White had made untrue statements about FTO Moorer to Corporal Cochran in retaliation for his unsatisfactory performance report; that he failed to obey a direct order to make a written report; and that he had made untrue statement to Lieutenant Hobbs during her investigation (*id*. at 24). She recommended that Mr. White be dismissed (*id*.). Based on this investigation Captain Campbell (the jail operations officer) and Major Seevers (the jail director) recommended to Sheriff Hall that Mr. White's employment be terminated due to insubordination and untruthfulness (doc. 63-4 at 1-2). Sheriff Hall terminated Mr. White's employment.[4]

In his third amended complaint, Mr. White makes the following charges of discrimination in violation of his rights under the Fourteenth Amendment based on his race:

1.  The Sheriff, Major Seevers and Captain Campbell wrongfully terminated his employment even though no white employees were terminated "for the same job performance."

2.  Captain Smith and Lieutenant Hobbs unfairly targeted him for an incident relating to FTO Moorer but failed to hold a white officer "who was present also to the same standard as the Plaintiff."

---

[4]This is not a case alleging retaliation. Retaliation cases typically involve a person complaining of racial discrimination and then being terminated in retaliation for the complaint. Nowhere in this record is there any indication that, before filing suit here, Mr. White mentioned his race as a factor in the events discussed.

3.    Lieutenant Ranger subjected him to different terms and conditions "compared to the white employees assigned to his unit."

4.    Corporal Cochran and FTO Moorer subjected him to different terms and conditions of training "compared to the white employees going through training," and Corporal Cochran continued to do so after training had been completed.

## EMPLOYMENT DISCRIMINATION AND 28 U.S.C. § 1983

Since passage of the Civil Rights Act of 1964 the usual method of presenting an employment discrimination case has been under Title VII of the Act. However, 28 U.S.C. § 1983 is also available to redress constitutional violations by those acting under color of law and, having failed to exhaust the administrative remedies required by Title VII, plaintiff proceeds here on the constitutional violations alone.

A plaintiff can establish a claim for employment discrimination through the use of direct, circumstantial, or statistical evidence. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).[5] When a plaintiff brings an action under § 1983, and where only circumstantial evidence exists, the court applies the burden-shifting procedure of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Abel v. Dubberly*, 210 F.3d 1334 (11th Cir. 2000) (holding that § 1983 and Title VII claims have the same elements if they involve the same facts).

A party proceeding under § 1983 will make out a *prima facie* case of racial discrimination if, in addition to the "under color of law" requirement, he can prove:

1.    That he belongs to a protected class;

2.    That he was qualified to do the job;

3.    That he was subjected to adverse employment action; and

---

[5] Mr. White has presented only slight circumstantial evidence of discrimination, as discussed below, and has presented no statistical analysis showing discrimination.

4.      That his employer treated similarly situated employees outside his class more favorably.

*Maniccia v.* Brown, 171 F.3d 1364, 1368 (11th Cir. 2004); *Knight v. Baptist Hosp. of Miami, Inc*., 330 F.3d 1313, 1316 (11th Cir. 2003). Once a plaintiff has established a *prima facie* case using the factors in *Maniccia* or has some other evidence of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.[6] This justification should be "clear, reasonably specific, and worthy of credence." *Hall v. Ala. Ass'n of Sch. Bds*., 326 F.3d 1157, 1166 (11th Cir. 2003). The employer, however, need not persuade the court that it was actually motivated by the proffered reason. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Thus, the defendant's burden is one of production, not persuasion. *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1087-88 (11th Cir. 2004). The Eleventh Circuit has stated that this burden is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 2004)(quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir.1994)).

Once the employer satisfies its burden of production by articulating one or more legitimate, nondiscriminatory reasons for its action, the presumption of discrimination is eliminated and the burden of production shifts back to the plaintiff to offer evidence that the alleged reason is a pretext for illegal discrimination. *Wilson*, 376 F.3d at 1087. The plaintiff can satisfy this requirement either directly by "persuading the court that a discriminatory reason more than likely motivated the employer" or indirectly by "persuading the court that the proffered reason for the employment decision is not worthy of belief." *Hall*, 326 F.3d at 1166. Where the employer offers multiple reasons for its decision, the plaintiff must produce

---

[6] Only the burden of production shifts to the defendant. The burden of persuasion always remains with the plaintiff. *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1088 (11th Cir. 2004).

sufficient evidence for a reasonable fact finder to conclude that each reason is pretextual. *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000). A plaintiff can establish that an employer's reasons are pretextual by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). Plaintiff, however, "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030 (quoting *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000). A plaintiff does not establish pretext by arguing that the defendant's decision was mistaken. See *Wilson*, 376 F.3d at 1092 (quoting *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)). Rather he must show that the decision was motivated by the plaintiff's race. *Id*. Title VII (and in the context of this case, § 1983) allows employers to terminate an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Despite the shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson*, 376 F.3d at 1088 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 256, 101 S.Ct. 1089, 1093, 1095, 67 L.Ed.2d 207 (1981)). Because of this, even though a plaintiff may establish a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, if no rational factfinder could conclude that the employer's action was discriminatory, then summary judgment may be warranted. *Chapman*, 229 F.3d at 1025 n. 11 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)).

Here, defendants all contend that they are entitled to qualified immunity in their individual capacities. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Andujar v. Rodriguez,* 486 F.3d 1199 (11th Cir. 2007); *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)); *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288, 1291 (11th Cir. 2009) ((quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (ruling that qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law'" (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001))). Qualified immunity is an immunity from suit rather than a mere defense to liability. *Pearson v. Callahan*, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

In order to receive the protection of qualified immunity, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Matthews v. Crosby,* 480 F.3d 1265, 1269 (11th Cir. 2007)(citing *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002))); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Once eligibility for qualified immunity is established, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Matthews,* 480 F.3d at 1269 (citing *Lee*, 284 F.3d at 1194). To do this, the plaintiff must show that the defendants (1) violated a constitutional right and (2) that this right was clearly established at the time of the incident. *Garczynski v. Bradshaw*, 2009 WL 1929191 (11th Cir. 2009) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005)); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Courts need not examine the two

prongs of the test in a particular order. *Pearson v. Callahan*, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). Once plaintiff fails to establish either the violation of a constitutional right, or that this right was clearly established, the court need not reach the second prong of the test. *Garczynski,* 2009 WL 1929191 (citing *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009)).

In this case the issue of whether any or all defendants are entitled to qualified is determined by the same measure. If Mr. White cannot succeed in his § 1983 claim by showing that there was a violation of his constitutional rights, then it follows that all defendants are entitled to qualified immunity. Accordingly, the approach to be used is the same.

## DISCUSSION

As an initial matter, the court notes, as defendants point out, that it is unclear whether Mr. White is suing any or all of the defendants in either their official or individual capacities. Because of that lack of clarity, both situations will be addressed as appropriate.

In this case there is no question that defendants were acting under color of law since the defendants are a sheriff and his deputies. Also, Mr. White clearly belongs to a protected class, and for purposes of this discussion he will be presumed qualified to do the job until he was terminated. Whether he was subjected to adverse employment discrimination and whether his employer treated similarly situated employees outside his class - whether he can identify a comparator - will be addressed as appropriate. Mr. White's claims differ among the individual defendants, so for convenience the following discussion is arranged by addressing all relevant claims against each defendant.

## A. SHERIFF HALL

Mr. White contends that Sheriff Hall "wrongfully terminated the Plaintiff's employment on 05/01/2007, because of his race (African American). Although, no white employees were dismissed for the same job performance (sic)." (Doc. 29, p. 2). He contends that this action was in violation of his Fourteenth Amendment right to equal protection. He also says (although his pleadings do not make this very clear) that he was denied both substantive and procedural due process.[7]

The due process claims are without merit. Mr. White cannot state a substantive due process claim against Sheriff Hall (or against any other defendant). "Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." *Silva v. Bieluch*, 351 F.3d 1045, 1047 (11th Cir. 2003) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994)). Moreover, Mr. White cannot make out a procedural due process claim because he was a probationary employee. As an employee Mr. White was subject to the Santa Rosa County Sheriff's General Order J-003 Disciplinary Guidelines and Standards ("General Order J-003"). General Order J-003 provides that all employees are subject to discipline for violating any of its requirements. Permanent employees can only be fired for just cause and are entitled to appeal any adverse actions to the county's Civil Service Board, which is vested with the authority to determine whether the Sheriff had just cause to suspend, demote, or terminate permanent employees. Permanent employees are those employees who have been employed "for a period of one year and [are] retained due

---

[7]Mr. White also contends that his rights under the dormant Commerce Clause, Art. I, § 8, clause 3, were violated. That clause empowers Congress to regulate commerce among the several states. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 115 S.Ct. 848, 133 L.Ed.2d 796 (1996). The "dormant" implication prohibits states from acting in such a way, as in taxation or regulation, that discriminates against other states. *General Motors Corp. v. Tracy*, 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1977). Mr. White has not shown any interstate nexus here, much less any action by a state that affects interstate commerce.

to satisfactorily meeting all requirements of such employment." Because Mr. White was employed less than one year at the time his employment was terminated, he was considered a probationary employee.  Probationary employees are employed "at will" and can be terminated for any reason not unlawful, without notice or an opportunity to improve performance or opportunity to appeal the Sheriff's decision. General Order J-003 makes clear that the guidelines for discipline and disciplinary procedures only apply to permanent employees.  See also *Silva*, 20 F.3d at 1047-48) (holding that promoted sheriff lieutenants have no right to their probationary rank until they have served one year in that rank).

As to the equal protection claim, where there is only circumstantial evidence of racial discrimination, the *McDonnell Douglas* framework is applied.[8]  In order to make a *prima facie* case Mr. White need only show that a similarly situated, non-African American employee was treated differently than he.  Mr. White's comparator is Detention Deputy Olson, who is white.  Mr. White contends that even though Olson was not (at the time) a certified law enforcement office as Mr. White was, Olson was not terminated.  This, he argues, shows that preferential treatment was given to a non-black employee who was less qualified than he was.  This evidence is insufficient.

To succeed Mr. White "must show that his employer treated similarly situated employees outside his classification more favorably." *Holifield*, 115 F.3d at 1562

---

[8]The only direct evidence of discrimination Mr. White offers is that Sheriff Hall knew he was black; there is no evidence in the record of racial slurs or other indicia of racial malice.  Mere knowledge of Mr. White's race is by itself insufficient, but in this case even that has not been proven.  Sheriff Hall attests that he does not recall ever meeting Mr. White and was unaware of his race until the complaint was filed in this court (doc. 65, Hall aff.)  Mr. White counters by swearing that the sheriff met the incoming class of deputy trainees, and that Mr. White was a member of that class and was obviously black.  However, there is no evidence anywhere in the record that the sheriff, even assuming that he had noticed that there was a black trainee in the group, knew that Mr. White was that particular trainee.  Also, Mr. White admits that he never met Sheriff Hall directly, or talked to him.  Consequently, Mr. White has failed to present direct evidence of discrimination by Sheriff Hall.

citing *Coutu v. Martin Cty. Bd. Of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995). The comparator employee(s) must be similarly situated to the plaintiff "in all relevant respects." *Id.* (citing *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985)). In analyzing whether employees are similarly situated when, as here, the questioned adverse action is one of discipline the court must "consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), opinion modified by 151 F.3d 1321 (11th Cir. 1998) (quoting *Holifield*, 115 F.3d at 1562). Courts, however, are reminded that, "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Maniccia*, 171 F.3d at 1369; see also *Nix*, 738 F.2d at 1187. Therefore, "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges," the similarly situated comparator's misconduct must be "nearly identical" in "quantity and quality." *Maniccia*, 171 F.3d at 1368-69 (citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)).[9]

Here, the fact that Detention Deputy Olson was less qualified than Mr. White (because he had not yet been certified as a law enforcement officer) is entirely beside the point. In order to be a comparator, Olson must have been similarly situated to Mr. White in the matter of misconduct and discipline. Nowhere in the record is there evidence that Olson was involved in any kind of misconduct, much less conduct nearly identical to the kind of misconduct (insubordination and

---

[9]There is an intra-circuit conflict over the question of whether the comparator's conduct must be "nearly identical" or just "similar" to the plaintiff's. Compare *Maniccia*, 171 F.3d at 1368-69, with *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1334 (11th Cir. 2000) ( "[T]he law only requires 'similar' misconduct from the similarly situated comparator."). Because *Maniccia* pre-dates *Alexander*, *Maniccia* is the law in this circuit and the case this court is bound to follow. See *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006).

untruthfulness) that caused Mr. White's employment termination.  Mr. White relies on weekly training reports that indicate that Olson had difficulties during training but completed training successfully in spite of these difficulties.  That is also beside the point.  Mr. White and Olson both successfully completed training, but Olson was not insubordinate and untruthful.  Therefore, Mr. White has entirely failed to establish the fourth factor necessary to show racial discrimination by circumstantial evidence under *Maniccia*, *supra*.

Mr. White also contends that Sheriff Hall (and others) did not give him remediation or counseling as they did some unidentified white deputies.  The white deputies who received remediation and counseling had some difficulties in performing their duties and were given training.  They were not guilty of insubordination and untruthfulness.  Thus they also are not comparators.

Even if Mr. White were successful in showing that there was a comparator, Sheriff Hall has come forward with race-neutral reasons for the action taken.  Sheriff Hall is the only person who has authority to terminate the employment of his deputies.  Major Seevers and Captain Campbell recommended that Mr. White, a probationary employee, be terminated based on an investigation showing that he was untruthful and insubordinate.  Sheriff Hall reasonably relied on the recommendations of Major Seevers and Captain Campbell and terminated Mr. White's employment.  There is no evidence to the contrary.  Moreover, he has terminated other probationary employees for violations of policy, and race is not a factor in any such decisions (doc. 65, Hall Aff.).

Mr. White attempts to meet this with two arguments.  First, he attacks the entire basis for the investigation and the resulting negative findings.  He contends that his original statements to Corporal Cochran were confidential, and that he had no intention of making a complaint, much less a formal complaint, against FTO Moorer.  However, nowhere does Mr. White point to evidence that he or any other

deputy is entitled to make "off the record" comments or state "confidential opinions" that are in effect accusations against a supervisor or superior officer that she uses double standards, nor can he show that being ordered to put his accusations in writing is "unlawful." The first time Mr. White made any negative comment about FTO Moorer was on January 16, 2007 when he complained that he did not know what she wanted and wondered whether he should quit. Those comments are the sort of thing employees say about their superiors all the time, and are relatively innocuous. However, when Mr. White talked to Corporal Cochran, he did not make innocuous general complaints. He made direct accusations of policy violations - that FTO Moorer failed to deal with a physical altercation between inmates and that she favored one inmate worker over others.

Sheriff Hall's regulations are very specific: instances of misconduct by a deputy, whether a superior or not, must be reported in writing (doc. 63-3, p. 31). When Corporal Cochran was told that FTO Moorer had engaged in misconduct she reported it up the chain of command. When she later told Mr. White to put his accusations in writing he refused, and when he was ordered to do so in writing, as he had requested, he compounded his problems by adding additional accusations to the list. Lieutenant Hobbs' investigation was thorough, and showed that FTO Moorer had done nothing improper. Rather, it showed that Mr. White had been untruthful. The records proved that FTO Moorer had reported the altercation between the inmates (which she did not directly witness), and that the supposedly favored inmate worker was not a worker at all and therefore could not have been given favorable treatment. Furthermore, there was no evidence that she talked on her cell phone, spent excessive time away from her duty station, or told female inmates to harass trainees.

Where Mr. White's case entirely fails in this regard is his total lack of proof to the contrary. He wants this court to disbelieve Lieutenant Hobbs' investigatory

findings, but he offers no evidence contrary to her findings other than his own conclusory statements that his employment was terminated due to racial discrimination. He denies, for example, that FTO Moorer did not see one inmate strike another, but that question is secondary. The conclusion Mr. White must address is not whether Lieutenant Hobbs was incorrect when she determined that FTO Moorer did not actually see the assault, but whether Lieutenant Hobbs' conclusion was racially motivated. Nothing in the record beyond Mr. White's conclusory allegations support such a finding.

Mr. White's second attack on Sheriff Hall's evidence on race neutral treatment makes reference to his official employment termination record. His Affidavit of Separation dated May 3, 2007 has a section entitled "Separation Reasons." Under the subsection "Administrative - Non-Routine" there is a check mark at "Failure to satisfactorily complete agency field training program (training performance issues)." (Doc. 64, ex. 8). Mr. White contends that this is fraudulent, because if in fact his employment was terminated for disciplinary reasons, there should have been a check by "Terminated for violation of agency policy" under subsection "Unfavorable - Misconduct." This, he argues, shows that the fired-for-misconduct position taken by the defendants is a sham.

The defendants present an affidavit by Captain Campbell, who is the overall manager of jail operations. He attests that insubordination and untruthfulness by probationary employees are considered to be failures to meet training standards, and that it is a common practice to indicate failure to meet job standards as the reason for termination of probationary employees.

Mr. White argues that the "Separation Reasons" prove that the claimed insubordination and untruthfulness are after-the-fact justifications for his being fired. This might have some force but for all the other contemporaneous evidence that events played out as described in the Factual Background section of this report

and recommendation.  The relevant events were recorded at the time they happened, and Mr. White has presented this court with absolutely nothing to challenge the reliability of the documentary record.  Based on the recommendation of several persons in his administration, Sheriff Hall terminated Mr. White's employment because he was untruthful and insubordinate.  If the administration does a favor to probationary employees by not disclosing the real reasons for their termination, that may be fudging, but the fudging works in favor of the employee, not the other way around.  The entry in Mr. White's discharge papers is insufficient to counter all the other evidence in the record, and therefore provides no basis for any reasonable person to conclude that it overcomes the defendants' proffered race-neutral reasons for terminating Mr. White's employment.

Finally, to the extent that Sheriff Hall is being sued in his official capacity, Mr. White's claim fails because *respondeat superior*, without more, does not provide a basis for recovery under section 1983.  *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981);  *Goebert v. Lee County,* 510 F.3d 1312, 1331 (11th Cir. 2007); *Cottone v. Jenne, 326* F.3d 1352 (11th Cir. 2003); *Harris v. Ostrout,* 65 F.3d 912, 917 (11th Cir. 1995).  "Supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); see also *Marsh v. Butler County,* 268 F.3d 1014, 1035 (11th Cir. 2001)*; Swint v. City of Wadley, Alabama,* 51 F.3d 988, 999 (11th Cir. 1995);  *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).

## B.  MAJOR SEEVERS and CAPTAIN CAMPBELL

Mr. White's claims against these two defendants are identical to the claims against Sheriff Hall.  For the same reasons discussed above, they fail.  Furthermore, because it is undisputed that only Sheriff Hall has the authority to terminate

employment, these two defendants cannot be held liable for the claim against them absent some proof that they intentionally mislead Sheriff Hall into firing Mr. White for racial reasons.  Mr. White also says that Major Seevers let white deputies have better shifts and positions then he was given, but he has not shown that this conduct adversely affected the terms and conditions of his employment (as discussed more fully concerning the claim against Lieutenant Ranger, below).

Evidence of any racial motivation or action is entirely lacking here.  Because Mr. White has failed to carry the burden of persuasion on his constitutional claim against Major Seevers and Captain Campbell at the summary judgment stage, they are entitled to summary judgment in their favor.  And as noted above, this also entitles them to qualified immunity.

### C.  CAPTAIN SMITH and LIEUTENANT HOBBS

Mr. White alleges that Captain Smith and Lieutenant Hobbs "unfairly targeted the Plaintiff for an incident relating to Field Training Officer/P. Moorer.  However, failed to hold a white officer who was present also to the same standard as the Plaintiff." (Doc. 29, p. 2).  Mr. White has completely failed to present facts to support this claim.  First, he has not presented evidence showing that either of these defendants adversely affected the terms and conditions of his employment (as discussed more fully concerning the claim against Lieutenant Ranger, below).  Furthermore, who the white employee was or what he or she did or failed to do in relation to Mr. White is unclear.  If Mr. White is saying that some white employee who saw the altercation between the female inmates was not disciplined because he or she did not report it, as Mr. White did not, that argument fails because that was not the basis for the discipline against Mr. White.  Mr. White was terminated because of insubordination and untruthfulness, not for failing to report the altercation.  As with Sheriff Hall, Mr. White has failed to show a comparator sufficient to carry the fourth requirement of a *prima facie* case.

If that burden were carried, Mr. White's claim against these two officers would still fail. Captain Smith ordered Mr. White to put his complaints against FTO Moorer in writing, nothing more. Mr. White may very well think that was "unfair," but he has given this court no facts to support his contention that Captain Smith, an African American female, did anything based on Mr. White's race. Lieutenant Hobbs investigated Mr. White's accusations against FTO Moorer and found them to be baseless. In the process, she found that Mr. White was untruthful. Mr. White says this was racially motivated and was a denial of his right to due process. The due process argument fails for the reasons discussed above. General Order J-003 makes clear that the guidelines for discipline and disciplinary procedures only apply to permanent employees. Mr. White was not entitled to notice of an investigation, to the opportunity to correct his deficiencies, or to any of the other procedural rights he claims.

As to the racial motivation of either Captain Smith or Lieutenant Hobbs, Mr. White has failed to present any evidence whatsoever that anything they did was a pretext for racial discrimination. Because Mr. White has failed to carry the burden of persuasion on his constitutional claim at the summary judgment stage against Captain Smith or Lieutenant Hobbs, they are entitled to summary judgment in their favor. And as noted above, this also entitles them to qualified immunity.

### D. LIEUTENANT RANGER

Mr. White contends that Lieutenant Ranger "subjected the Plaintiff to different terms and conditions compared to white employees assigned to his shift." (Doc. 29, p. 2). Specifically, Mr. White contends that whenever he was assigned to a shift with a Deputy Harden or Hardy, she would not stay on post but would be on the internet instead of working. That left Mr. White to do the job alone. Then, when Mr. White complained to Lieutenant Ranger, nothing would be done. Lieutenant Ranger was therefore treating Mr. White differently than Deputy Harden (or Hardy) (doc. 63-3, pp.

28-29). Mr. White had the same problem relative to Deputy Cook, who was a white newer hire but was allowed to "come and go as he please[d]." (*Id.* at 30)

The Eleventh Circuit discussed the meaning of a change in the terms and conditions of employment in *Davis v. Town of Lake Oak, Fla.*, 245 F.3d 1232 (11th Cir. 2001).

> It is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. See *Doe* [*v. DeKalb County School Dist.*], 145 F.3d [1441,] 1453 [11[th] Cir. 1998]) (test for adverse employment action in ADA case patterned after Title VII is whether "a reasonable person in [the employee's] position would have found [the alleged alteration of the terms and conditions of employment] to be adverse under all the facts and circumstances").

245 F.3d at 1239-40. In *Davis*, the court held that a negative job performance memorandum and changes in work assignments that were essentially demotions (without change in pay status) did not meet the definition of adverse employment action. The same result applies here. Having to work harder than a co-worker is an all-too-common occurrence in the working world, but it does not rise to adverse employment action. Mr. White has failed to meet the third requirement of presenting a *prima facie* case under *Maniccia, supra*. Because plaintiff has failed to carry the burden of persuasion on his constitutional claim against Lieutenant Ranger at the summary judgment stage, Ranger is entitled to qualified immunity and summary judgment in his favor.

### E.  CORPORAL COCHRAN and FTO MOORER.

Finally, Mr. White contends that Corporal Cochran and FTO Moorer "subjected the Plaintiff to different terms and conditions of training compared to the white employees going through training.  However, Corporal/J. Cochran continued to subject the plaintiff to different terms and conditions compared to the white employees that had completed training (sic)."  (Doc. 29, pp. 2-3).  These claims fail for the same reason as the claims against Lieutanant Ranger.  Mr. White has not presented any evidence that either of these defendants did anything to adversely affect the terms and conditions of his employment.  To the contrary, he admitted in his deposition that his terms and conditions did not change until after he was already out from under FTO Moorer's supervision (doc. 63-2. p. 17).  When asked whether he told Corporal Cochran that he as being treated differently by FTO Moorer because of his race, he responded "Not - - didn't make a racial issue.  But I made it known to her that I felt I was being treated differently than the other trainees . . . ."  (*Id.*, at 32).  Other than the generalized complaints discussed above, such as being given more difficult shifts and less training, Mr. White has presented this court with no evidence that Corporal Cochran or FTO Moorer did anything that adversely affected the terms and conditions of his employment.  Mr. White has failed to meet the third requirement of presenting a *prima facie* case.  Because he has failed to carry the burden of persuasion on his constitutional claim against Corporal Cochran or FTO Moorer at the summary judgment stage, they are entitled to summary judgment in their favor.  And as noted above, this also entitles them to qualified immunity.

### CONCLUSION

The facts are undisputed that Mr. White was hired as a probationary deputy and went through a training course with other such deputies, all of whom were

white.  During the last week of training Mr. White and FTO Moorer, a black Corporal who was at that time his supervisor, had a disagreement.  On the last day of training FTO Moorer gave Mr. White an unsatisfactory rating on that week's training.  Mr. White successfully completed training in spite of this rating.  Mr. White went to the training supervisor, Corporal Cochran, and told her his "opinions" of FTO Moorer's "double standards."  Corporal Cochran took Mr. White's "opinions" as accusations of misconduct on the part of FTO Moorer.  It was reasonable for her to so treat the "opinions" because they were statements that FTO Moorer was derelict in her duty.  Thus, perhaps without meaning to, and in any event unwisely, Mr. White started a process in which FTO Moorer's actions were investigated (with new allegations added by Mr. White).  The investigator cleared FTO Moorer but concluded that Mr. White was untruthful both in his accusations and in some of his responses to the investigator.  The investigator sent her report up the chain of command, and the jail director and jail operations manager recommended to Sheriff Hall that Mr. White's employment be terminated.

Not once during this entire process was the matter of Mr. White's race mentioned.  He did not complain that he was being singled out for anything due to his race, nobody at the jail commented on his race, and Sheriff Hall, the ultimate authority at the jail, did not know Mr. White's race.  Mr. White has made numerous and varied arguments in support of his claims, but has failed to show anyone at the jail treated *similarly situated* employees outside his class more favorably than him.  And as to all defendants other then Sheriff Hall, who alone had the authority to terminate Mr. White's employment, he has not shown that the terms and conditions of his employment were adversely affected.  Sheriff Hall, in turn, not knowing Mr. White's race, accepted the recommendation of his responsible subordinates after an investigation, and terminated this probationary employee for cause even though no cause was required.

The facts, read in the light most favorable to Mr. White, are simply devoid of even a *hint* of racial discrimination.  None of the defendants, although acting under color of law, violated any of Mr. White's constitutional rights.

Accordingly, it is respectfully RECOMMENDED that the defendants' motion for summary judgment (doc. 61) be GRANTED, that Mr. White's motion for summary judgment (doc. 64) be DENIED, and that the clerk be ordered to enter final judgment against the plaintiff and in favor of all defendants and close the file.

At Pensacola, Florida, this 11th day of August, 2009.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).